IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br>v.<br><br>CHIROPRACTIC ASSOCIATES, LTD.<br>OF SOUTH DAKOTA,<br><br>    *Defendant.* | CASE NO. CV 13-04030 |

**RESPONSE OF PLAINTIFF UNITED STATES TO PUBLIC COMMENT ON THE PROPOSED FINAL JUDGMENT**

Pursuant to the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), the United States hereby files the single public comment concerning the proposed Final Judgment in this case (*see* Exhibit A) and the United States' response to that comment. After careful consideration of the comment, the United States continues to believe that the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Complaint. The United States will move the Court for entry of the proposed Final Judgment after the public comment and this response have been published in the *Federal Register*, pursuant to 15 U.S.C. § 16(d).

    **I. PROCEDURAL HISTORY**

On April 8, 2013, the United States filed a civil antitrust Complaint against Defendant Chiropractic Associates, Ltd. of South Dakota ("CASD")

alleging that CASD negotiated at least seven contracts with payers that set prices for chiropractic services on behalf of CASD's members in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. CASD's actions raised prices for chiropractic services and decreased the availability of chiropractic services in South Dakota.

Simultaneously with the filing of the Complaint, the United States filed a proposed Final Judgment and a Stipulation signed by the United States and CASD consenting to entry of the proposed Final Judgment after compliance with the APPA, 15 U.S.C. § 16. The proposed Final Judgment would prevent the recurrence of the violations alleged in the Complaint by enjoining the Defendant from jointly determining prices and negotiating contracts with payers.

Pursuant to the requirements of the APPA, the United States (1) filed its Competitive Impact Statement ("CIS") with the Court on April 8, 2013; (2) published the proposed Final Judgment and CIS in the Federal Register on April 17, 2013 (*see* 78 Fed. Reg. 22901); and (3) had summaries of the terms of the proposed Final Judgment and CIS, together with directions for the submission of written comments relating to the proposed Final Judgment, published in (a) *The Washington Post* for seven days beginning on April 15, 2013, and ending on April 21, 2013, and (b) *The Argus Leader* for seven days beginning on April 15, 2013 and ending on April 21, 2013. The Defendant filed the statement required by 15 U.S.C. § 16(g) on April 18, 2013. The sixty-day public comment period ended on June 20, 2013. One comment was received,

as described below and attached hereto.

## II. THE INVESTIGATION AND PROPOSED RESOLUTION

On June 7, 2011, the United States Department of Justice (the "Department") opened its investigation into the conduct at issue. The Department conducted a detailed investigation into CASD's actions. As part of this investigation, the Department obtained and considered more than 240,000 documents.

From this investigation, the Department concluded that CASD's conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1. As more fully explained in the CIS, the Stipulation and proposed Final Judgment in this case are designed to prevent the recurrence of the violations alleged in the Complaint and restore competition in the sale of chiropractic services in South Dakota.

Specifically, Section IV of the proposed Final Judgment would enjoin CASD from:

(A)  providing, or attempting to provide, any services to any physician regarding such physician's actual, possible, or contemplated negotiation or contracting with any payer, or other dealings with any payer;

(B)  acting, or attempting to act, in a representative capacity, including as a messenger or in dispute resolution (such as arbitration);

(C)  communicating, reviewing, or analyzing, or attempting to communicate, review, or analyze with or for any physician, except as otherwise allowed, about (1) that physician's, or any other physician's, negotiating, contracting, or participating status with any payer; (2) that physician's, or any

other physician's, fees or reimbursement rates; or (3) any proposed or actual contract or contract term between any physician and any payer;

(D)   facilitating communication or attempting to facilitate communication, among or between physicians, regarding any proposed, contemplated, or actual contract or contractual term with any payer, including the acceptability of any proposed, contemplated, or actual contractual term, between such physicians and any payer;

(E)   entering into or enforcing any agreement, arrangement, understanding, plan, program, combination, or conspiracy with any payers or physicians to raise, stabilize, fix, set, or coordinate prices for physician services, or fixing, setting, or coordinating any term or condition relating to the provision of physician services;

(F)   requiring that CASD physician members negotiate with any payer through CASD or otherwise restricting, influencing, or attempting to influence in any way how CASD physician members negotiate with payers;

(G)   coordinating or communicating, or attempting to coordinate or communicate, with any physician, about any refusal to contract, threatened refusal to contract, recommendation not to participate or contract with any payer, or recommendation to boycott, on any proposed or actual contract or contract term between such physician and any payer;

(H)   responding, or attempting to respond, to any question or request initiated by any payer or physician relating to (1) a physician's negotiating, contracting, or participating status with any payer; (2) a physician's fees or

reimbursement rates; or (3) any proposed or actual contract or contract term between any physician and any payer, except to refer a payer to a third-party messenger[1] and otherwise to state that the Final Judgment prohibits any additional response; and

(I)   training or educating, or attempting to train or educate, any physician in any aspect of contracting or negotiating with any payer, including, but not limited to, contractual language and interpretation thereof, methodologies of payment or reimbursement by any payer for such physician's services, and dispute resolution such as arbitration, except that CASD may, provided it does not violate other prohibitions of the Final Judgment, (1) speak on general topics (including contracting), but only when invited to do so as part of a regularly scheduled medical educational seminar offering continuing medical education credit; (2) publish articles on general topics (including contracting) in a regularly disseminated newsletter; and (3) provide education to physicians regarding the regulatory structure (including legislative developments) of workers' compensation, Medicaid, and Medicare, except Medicare Advantage.

---

[1] A messenger is a person or entity that operates a messenger model, which is an arrangement designed to minimize the costs associated with the contracting process between payers and health-care providers. Messenger models can operate in a variety of ways. For example, network providers may use an agent or third-party to convey to purchasers information obtained individually from providers about the prices or price-related terms that the providers are willing to accept. In some cases, the agent may convey to the providers all contract offers made by purchasers, and each provider then makes an independent, unilateral decision to accept or reject the contract offers. *See* Statement 9(C) of the 1996 Statements of Antitrust Enforcement Policy in Health Care, *available at* http://www.justice.gov/atr/public/guidelines/1791.htm.

With limited exceptions, Section V of the proposed Final Judgment requires CASD to terminate all payer contracts at the earlier of (1) CASD's receipt of a payer's written request to terminate its contract, (2) the earliest termination date, renewal date (including automatic renewal date), or the anniversary date of such payer contract, or (3) three months from the date the Final Judgment is entered.  Furthermore, the Final Judgment immediately makes void any clause in a provider agreement that disallows a physician from contracting individually with a Payer.

To promote compliance with the decree, Section VII of the proposed Final Judgment requires that CASD provide to its members, directors, officers, managers, agents, employees, and representatives, who provide or have provided, or supervise or have supervised the provision of services to physicians, copies of the Final Judgment and this Competitive Impact Statement and to institute mechanisms to facilitate compliance.  Finally, for a period of ten years following the date of entry of the Final Judgment, CASD must certify annually to the United States whether it has complied with the provisions of the Final Judgment.

### III.   STANDARD OF JUDICIAL REVIEW

The Tunney Act requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).  In making that determination, the court, in accordance with the statute as amended in 2004,

is required to consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the United States is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995). *See also United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965 (JR), at *3, (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable.").

Under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the United

States' complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"); *see generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' "prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case").

Courts have less flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *United States v. Abitibi-Consolidated, Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008) (*citing SBC Commc'ns*, 489 F. Supp. 2d at 17).

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its

complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60. As the United States District Court for the District of Columbia confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments,[3] Congress made clear its intent to preserve the practical benefits of using consent decrees in antitrust enforcement, stating that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to

---

[3] The 2004 amendments substituted "shall" for "may" in directing relevant factors for the court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

intervene." 15 U.S.C. § 16(e)(2). This language reflects what Congress intended when it enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public-interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.

### IV. SUMMARY OF PUBLIC COMMENT AND THE UNITED STATES' RESPONSE

During the sixty-day comment period, the United States received one public comment, which the comment says is from an anonymous South Dakota resident who consumes chiropractic care.

#### A. Summary of Comment

The commenter argues that the proposed Final Judgment does nothing to punish CASD's principals for their conduct because the proposed Final Judgment affixes no fine or penalty. The commenter urges the Court to issue substantial monetary penalties.

#### B. The United States' Response

The lack of fines or other penalties in the proposed Final Judgment is not a valid basis for challenging its entry for two reasons. First, criminal fines and other criminal penalties are not available in this case because it is a civil

action.  Second, the purpose of this Tunney Act proceeding is to determine whether the proposed Final Judgment resolves the violations identified in the Complaint in a manner that is within the reaches of the public interest.  The commenter does not argue that the proposed Final Judgment will not remedy the violations alleged in the Complaint.  Indeed, the proposed Final Judgment contains prohibitions which, as described in Section II and the CIS, broadly enjoin the Defendant from jointly determining prices and negotiating contracts with payers.  Because the proposed Final Judgment will remedy the violations alleged in the complaint and restore competition in the sale of chiropractic services in South Dakota, the proposed Final Judgment is within the reaches of the public interest.

## V.  CONCLUSION

After reviewing the public comment, the United States continues to believe that the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Complaint and is therefore in the public interest.  Accordingly, after the comment and this Response are published in the *Federal Register*, the United States will move this Court to enter the proposed Final Judgment.

Dated: August 5th, 2013

Respectfully submitted,

**UNITED STATES OF AMERICA**
BRENDAN JOHNSON
United States Attorney

*/s/ Cheryl Schrempp DuPris*
Cheryl Schrempp DuPris
Assistant United States Attorney
P.O. Box 7240
225 S. Pierre Street, Suite 337
Pierre, S.D. 57501
(605) 224-1256 ext 2204
Cheryl.Dupris@usdoj.gov

*/s/ Richard D. Mosier*
RICHARD D. MOSIER
(D.C. Bar No. 492489)
Attorney for the United States
Antitrust Division
United States Department of Justice
450 Fifth Street, N.W., Suite 4100
Washington, D.C. 20530
Telephone: (202) 307-0585
Facsimile: (202) 307-5802
Email: Richard.Mosier@usdoj.gov

## CERTIFICATE OF SERVICE

I, Richard D. Mosier, hereby certify that on August 5, 2013, I electronically filed the Response of Plaintiff United States to Public Comment on the Proposed Final Judgment and the attached Public Comment with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following counsel:

**For Defendant CASD:**

Mark A. Jacobson, Esq.
Lindquist & Vennum PLLP
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 371-3211
Facsimile: (612) 371-3207
Email: mjacobson@lindquist.com

Daniel R. Fritz, Esq.
Lindquist & Vennum PLLP
101 S. Reid Street, Suite 302
Sioux Falls, SD 57103
Telephone: (605) 978-5205
Facsimile: (605) 978-5225
Email: dfritz@lindquist.com

_____
RICHARD D. MOSIER
(D.C. Bar No. 492489)
Attorney for the United States of America
Litigation I Section
Antitrust Division
United States Department of Justice
450 Fifth Street, N.W., Suite 4100
Washington, DC 20530
Telephone: (202) 307-0585
Facsimile: (202) 307-5802
E-mail: Richard.Mosier@usdoj.gov